UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

JUSTIN PANEK,

Plaintiff,

v.

STATE OF OREGON *by and through the Oregon Department of Corrections*, MELANIE LOVELAND, DUSTI HUNTER, and CYNTHIA DIETER,

Defendants.

Case No. 2:24-cv-01651-AR

**FINDINGS AND RECOMMENDATION**

---

**ARMISTEAD, United States Magistrate Judge**

Plaintiff Justin Panek is an adult in custody (AIC) with the Oregon Department of Corrections (ODOC) and housed at Two Rivers Correctional Institute (TRCI).[1] This suit arises out of two back injuries sustained by Panek in 2022. The first occurred in July, after which he received medical treatment, stopped working, and visited the infirmary daily to do physical

---

1 The parties request oral argument. The court, however, does not believe that oral argument would help resolve the pending motion. *See* LR 7-1(d)(1).

therapy. The second occurred in October 2022 while Panek was working in the TRCI kitchen. Panek alleges that, after he stole Ensure protein drinks from the infirmary, defendants Cynthia Dieter, Dusti Hunter, and Melanie Loveland retaliated against him by orchestrating his assignment to the kitchen despite his known injury and work restriction. Loveland was supervising in the kitchen that day. When Panek told her that he could not work due to his back injury, she made him work anyway. Panek obeyed, and while he was pushing a heavy food cart, injured his back again.

Panek sued Dieter, Hunter, and Loveland for violating his Eighth Amendment rights and ODOC for negligently handling his medical care. Together, defendants move for summary judgment on all Panek's claims. For the reasons described below, because only the Eighth Amendment claims against Hunter and Loveland have genuine issues of material fact, defendants' motion (ECF 23) should be GRANTED in part and DENIED in part.

**BACKGROUND**

On July 3, 2022, Panek was exercising in the yard at TRCI. Panek typically did calisthenics—"push-ups, sit-ups, stuff like that." (Panek Dep. 34:24–35:1, ECF 33 at 12.) But on this day, someone invited him to try deadlifts. On his third deadlift, Panek felt his lower back pop. He approached the correctional officer on duty who, seeing that Panek couldn't stand up straight and was in obvious pain, sent him to medical for treatment. Panek received medication and a follow-up appointment with the medical staff at TRCI a few days later. (*Id.* 35:1–36:9, ECF 33 at 12.) On the day of his injury, the care provider ordered Panek to apply ice for three days and sleep in the low bunk and avoid stairs for two weeks. (Burgess Decl. Ex. H, ECF 33 at

155.) Panek went to the hospital a few days later for an x-ray and evaluation. (Panek Dep. 39:1-20, ECF 33 at 13; Burgess Decl. Ex. H, ECF 33 at 155.)

Panek's injury caused radiating pain and numbness. (Panek Dep. 41:8-18, ECF 33 at 13.) Throughout July and August, the care providers at TRCI prescribed pain medications and permitted Panek to wear medical sweatpants. (Burgess Decl. Ex. H, ECF 33 at 151-55.) The medical staff also ordered three sessions with TRCI's physical therapist, Dr. Snell. (Burgess Decl. Ex. H, ECF 33 at 154; Panek Dep. 51:15-19, ECF 33 at 16.) In August, Panek underwent an MRI that revealed disc herniations at L4-5 and L5-S1. (Burgess Decl. Ex. I, ECF 33 at 158.)

Between July 3 and October 13, 2022, Panek, needing a wheelchair and a cane at times, did not work.[2] (Panek Dep. 43:23-25, 80:2-5, ECF 33 at 14, 23.) In September, TRCI medical staff ordered Panek to sleep in the low bunk for three months. (Burgess Decl. Ex. H, ECF 33 at 150.) Panek also visited the infirmary every day for physical therapy exercises and to use the inversion table as instructed by Snell. (*Id.* 44:1-9, ECF 33 at 14.) He needed to sign in each visit. (*Id.* 56:16-21, ECF 33 at 17.) Defendant Cynthia Dieter worked as the Nurse Manager and observed Panek in the infirmary using the inversion table. (Dieter Dep. 9:10–10:25, ECF 33 at 61.)

On or around October 12, 2022, Panek was caught drinking Ensure drinks stored in the infirmary closet. (Panek Dep. 56:25–57:22, ECF 33 at 17.) Dieter informed the corrections officer on duty about the incident. (*Id.* 57:14–58:13, ECF 33 at 17-18; Dieter Dep. 14:9-15, ECF

---

[2] Before his injury in July 2022, Panek worked as an aide for another AIC who needed help with daily tasks. (Panek Dep. 49:1-4, ECF 33 at 15.)

33 at 65.) The corrections officers told Panek that Dieter wanted him sent to DSU.[3] Panek received a 72-hour cell-in as punishment. (*Id.* 58:1–59:6, ECF 33 at 18.) Within a day or two, while still on the cell-in, Panek was assigned to work in the TRCI kitchen starting on October 14, 2022. (*Id.* 61:1-20; Burgess Decl. Ex. E, ECF 33 at 145.)

AICs at TRCI received work assignments through the inmate work program (IWP). As an IWP coordinator, defendant Dusti Hunter issued work assignments. Before assigning an AIC to a job, Hunter would review the AIC's file on what's called the AS-400 for any medical restrictions or notes about their physical ability. (Hunter Dep. 10:17-22, ECF 33 at 101.) Hunter was aware that working in the kitchen was a physical job that might require lifting and pushing heavy carts or trays. (*Id.* 20:9-11, ECF 33 at 111.) She would not assign someone who was over 60, for instance, to work in the kitchen because it required standing for prolonged periods. (*Id.* 11:8-12, ECF 33 at 102.)

Panek had not worked since his injury in July, and he had never worked in the kitchen. (Panek Dep. 31:23-25, ECF 33 at 11; Burgess Decl. Ex. E, ECF 33 at 145.) On the morning of his shift, Panek told the correctional officer on his unit that he was on a work restriction. The officer told him that if he was on the callout for a work assignment in the kitchen, he needed to go down to the kitchen. Panek obeyed. (Panek Dep. 72:15-21, ECF 33 at 21.) As soon as he arrived, he told the food service coordinator, defendant Melanie Loveland, that he was on a medical hold due to a back injury and not supposed to work in the kitchen. (Loveland Dep.

---

[3] DSU, also referred by Panek to as "the hole" (Panek Dep. 58:2-13, ECF 33 at 18), stands for Disciplinary Segregation Unit. AICs in DSU are separated from the main prison population as a disciplinary measure. *See* OAR 291-011-0010 (defining Disciplinary Segregation).

10:16-18, 13:6-9, ECF 33 at 131, 134.) Loveland told him that he had a job to do, he had to do it, and that she would check into it. (Panek Dep. 72:19–7317, Loveland Dep. 10:16-24, ECF 33 at 21, 131.) Loveland could not access the AS-400 (Loveland Dep. 9:12-18, ECF 33 at 130) but told Panek that she called Hunter at IWP (Panek Dep. 78:7-9, ECF 33 at 23).

In addition to telling Loveland about his back injury, Panek was wearing medical sweats reserved for injured prisoners and walking slowly. He also had a call out for his daily physical therapy in the infirmary later that day. Following his injury in July, Panek used a wheelchair and then a cane, and Loveland told him that "it was good to see that [he] was actually able to walk." (*Id.* 79:8-25.) Loveland did not assign him a different task to accommodate his injury, however. (Loveland Dep. 13:6-14, ECF 33 at 134.) According to Loveland, it "did not seem like he could not work." (*Id.* 10:18-20, ECF 33 at 131.) Although she could have, Loveland also did not call health services to inquire about Panek's injury. (*Id.* 18:11-23, ECF 33 at 139.)

Panek worked in the kitchen for a few hours. (Panek Dep. 75:8-10, ECF 33 at 22.) As a hot food server, he handled loading and pushing the food service cart. (Burgess Decl. Ex. F, ECF 33 at 146.) The long metal cart holds five four-gallon containers, and when full, like it was that day, weighs hundreds of pounds. (Panek Dep. 74:1-14, Loveland Dep. 12:20–13:5, ECF 33 at 22, 134-35.) Panek loaded the cart, and as he was pushing it, he felt another pop in his lower back, along with a sharp pain. (Panek Dep. 107:21-24, ECF 33 at 30.) His leg went numb and he was in "excruciating pain." (*Id.* 74:20-25, ECF 33 at 22.) Before leaving the kitchen, Panek drafted a note documenting the incident. He wrote that he was assigned as a food server and was told to push the cart, despite his injury. (Burgess Decl. Ex. F, ECF 33 at 146.) He also noted the pop in

his back and the accompanying pain. Loveland signed and dated the note. (*Id.*; Loveland Dep. 11:8–12:16, ECF 33 at 132-33.)

Panek was scheduled to work in the kitchen again on October 15 and 16. Although he was in pain, he still had to walk down to the kitchen and sign in for his shifts before being excused. (Panek Dep. 84:5-16, ECF 33 at 24.) On October 15th, Panek sent a medical kite asking why he was still assigned to the kitchen despite his work restriction. Panek received a response on October 16 that said he was "on medical restrictions from work and from sports until 10/18/22." (Burgess Decl. Ex. G, ECF 33 at 147.) Hunter testified that, if an AIC cannot work for some reason, they are to report that to their supervisor who "would send them back to their unit and tell them to sign up for sick call so that medical can evaluate them." (Hunter Dep. 14:8-19, ECF 33 at 105.) When Panek reported to the kitchen on October 15 and 16 and asked to leave because of his injury, he was allowed to do so. (Panek Dep. 84:10–86:11, ECF 33 at 24-25.)

The TRCI medical staff did not evaluate Panek until October 17, 2022, three days after his alleged reinjury. He was deemed medically idle at that point. The medical staff ordered Panek muscle relaxers, an x-ray, and a one-week break from the inversion table; his medical sweats were extended for two months. The order included a work restriction until December 18, 2022. (Panek Dep. 88:2-16, ECF 33 at 25.) Panek was also to be provided with a wheelchair for one month for long distances. (Burgess Decl. Ex. H, ECF 33 at 150; Thompson Decl. Ex. C, ECF 24-3 at 5.) Hunter learned from Panek's kites that he reinjured his back in the kitchen. (Hunter Dep. 22:1-15, ECF 33 at 113.) Panek testified that he later ran into her in the hallway and she apologized "for what had happened to [him] being put in the kitchen." (Panek Dep. 64:8-17, ECF 33 at 19.)

In this negligence and civil rights action, Panek asserts that Dieter, Hunter, and Loveland were deliberately indifferent to his serious medical needs when they knew he was injured and forced him to work a physically demanding job in the TRCI kitchen, violating his Eighth Amendment rights. Panek accuses Dieter of "orchestrating his assignment to the kitchen" in retaliation for taking the Ensure drinks, Hunter of assigning him to the kitchen despite knowledge of his injury and work restriction, and Loveland of requiring him to work and push the heavy dish cart even after he protested, causing him to reinjure his back. (Compl. ¶¶ 28-29, ECF 1 at 7.) Panek also asserts that ODOC was negligent when it assigned him to a "physically strenuous" job despite his known medical condition. (*Id.* ¶ 38, ECF 1 at 9.) ODOC's treatment, in Panek's view, fell below the appropriate standard of medical care. (*Id.*) Panek seeks economic and noneconomic damages for his physical and emotional injuries. (*Id.* ¶ 43, ECF 1 at 10.)

Defendants advance three arguments for summary judgment: (1) Oregon's Inmate Injury Fund provides the exclusive remedy for Panek's workplace injury under ORS § 655.510(4); (2) Panek fails to establish First Amendment retaliation or Eighth Amendment deliberate indifference claims under 42 U.S.C. § 1983; and (3) Panek's negligence claim against ODOC is barred by Eleventh Amendment sovereign immunity. (*See generally*, Defs.'s Mot. Summ. J. (MSJ), ECF 23.) Without conceding the merits, Panek agrees that this court lacks jurisdiction over his state law negligence claim under the Eleventh Amendment. (Pl.'s Resp., ECF 32 at 1.) That claim should be dismissed. Relatedly, defendants abandon their motion as it relates to Oregon's Inmate Injury Fund but reserve the right to assert that argument in any future state court action. (Defs.'s Reply, ECF 36 at 1.) Finally, the parties agree that Panek did not assert a

retaliation claim under the First Amendment. (Pl.'s Resp., ECF 32 at 10; Defs.'s Reply, ECF 36 at 2.) Only Panek's Eighth Amendment claim remains to be decided.

## LEGAL STANDARD

A party is entitled to summary judgment under Federal Rule of Civil Procedure 56 "only if, taking the evidence and all reasonable inferences in the light most favorable to the non-moving party, there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law." *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1104 (9th Cir. 2020) (quoting *Tauscher v. Phx. Bd. of Realtors, Inc.*, 931 F.3d 959, 962 (9th Cir. 2019)); FED. R. CIV. P. 56(a). A dispute is genuine only if there is sufficient evidence "such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute on summary judgment. *Id.* at 255.

Summary judgment involves burden shifting. Defendants, as the moving party without the ultimate burden of persuasion at trial, have "both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry their burden of production, defendants "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id.* To carry their burden of persuasion, defendants "must persuade the court that there is no genuine issue of material fact." *Id.* If the defendants carry their burden of production, Panek, as the nonmoving party, must

produce evidence to support his claims, *id.* at 1103, and must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996); *FTC* v. *Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) ("A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment."). If Panek does not make that showing, then defendants are entitled to summary judgment. *Nissan Fire*, 210 F.3d at 1103.

**DISCUSSION**

"The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement." *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Although "conditions of confinement may be, and often are, restrictive and harsh, they 'must not involve the wanton and unnecessary infliction of pain.'" *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

To establish an Eighth Amendment violation under § 1983, Panek must satisfy "both the objective and subjective components of a two-part test." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). First, Panek must show "'a serious medical need' by demonstrating that 'failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Serious medical needs include those "that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (quotation omitted).

To satisfy the subjective element, Panek must show that the prison officials—here, Dieter, Hunter, and Loveland—"acted with deliberate indifference." *Toguchi*, 391 F.3d at 1057 (citation and quotation marks omitted). Officials act with deliberate indifference when they are aware that a prisoner faces "a substantial risk of serious harm and [they] disregard that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Denying, delaying, or intentionally interfering with medical treatment may qualify as deliberate indifference. *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002). For prison work, the Eighth Amendment is implicated "only when a prisoner employee alleges that a prison official compelled him to 'perform physical labor which was beyond his strength, endangered his life or health, or caused undue pain.'" *Morgan*, 465 F.3d at 1045 (quoting *Berry v. Bunnell*, 39 F.3d 1056, 1057 (9th Cir. 1994) (per curiam)).

The parties do not dispute the seriousness of Panek's back injury. But according to Dieter, Hunter, and Loveland, Panek cannot establish that they acted with deliberate indifference. They assert that there is neither "admissible evidence" that Dieter played a role in Panek's assignment to the kitchen nor admissible evidence that Dieter, Hunter, and Loveland conspired together to force Panek to work in the kitchen despite his injury. (Defs.'s MSJ, ECF 23 at 9.) They also argue that there is no evidence that Panek was work-restricted the day of his alleged reinjury in the kitchen, nor is there any evidence that they knew he was injured or on a work restriction. Loveland maintains that Panek did not "present with a limp or use a mobility aide that would suggest [he] would have physical difficulty completing his assignment." (*Id.*)

Panek responds that defendants' arguments ignore the record and triable issues of fact preclude summary judgment. (Pl.'s Resp., ECF 32 at 11.) With respect to Hunter and Loveland,

the court agrees that they are not entitled to summary judgment. Dieter, on the other hand, is entitled to summary judgment because Panek fails to establish a genuine dispute as to her personal participation in the alleged constitutional violation. The court addresses Dieter, Hunter, and Loveland in turn.

### *A. Dieter*

The parties dispute Dieter's personal involvement in Panek's assignment to the kitchen. Panek alleges that Dieter, along with Hunter and Loveland, "forc[ed] him to return to work in the prison kitchen, a task that required lifting and pushing heavy objects, which was contraindicated by his medical condition." (Compl. ¶ 28, ECF 1 at 7.) Panek testified that, when he got caught stealing the Ensures, Corrections Officer Winett told Panek that Dieter "wanted [him] to be thrown in DSU for stealing prescription medication." (Panek Dep. 58:2-6, ECF 33 at 18.) After Winett refused, Dieter called Winett's higher-up, Captain Lionel, to push for Panek to be put in DSU. Lionel called Panek to his office later that day and told him that Dieter was "hounding him about putting [Panek] in the hole." (*Id.* 58:14–59:2.) Lionel told Panek that he was not going to send him to DSU for stealing the Ensures. Instead, he would be on a 72-hour cell-in. (*Id.* 59:2-6.) Panek learned all of this from Winett and Lionel. He did not have any in-person interaction with Dieter. (*Id.* 59:7–60:21.)

Panek's theory is that Dieter, frustrated that the officers did not punish him sufficiently, orchestrated his assignment to the kitchen. (*See* Panek Dep. 58:14, ECF 33 at 18 (explaining the "Dieter wasn't satisfied" with a 72-hour cell-in).) Dieter admits that she likely would have spoken with the officer on duty in the infirmary that day about Panek stealing the Ensures but could not recall speaking with any correctional staff, what they may have spoken about, or what

punishment Panek received for stealing the Ensures. She denies speaking with IWP about Panek or his work assignment. (Dieter Dep. 13:9–14:20, ECF 33 at 64-65.) Hunter, the IWP coordinator, denied having a verbal conversation with Dieter about Panek, saying that any conversation would have been over email. (Hunter Dep. 22:24–23:4, ECF 33 at 113-14.) No relevant emails are in the record, nor is any testimony from Winett or Lionel. Lionel has since passed away. (Panek Dep. 58:15-16, ECF 33 at 18.)

Dieter argues that Panek's evidence of her involvement is not admissible and he therefore fails to raise a genuine dispute of material fact. As Nurse Manager, Dieter was aware that Panek visited the infirmary to do physical therapy and use the inversion table. (Dieter Dep. 10:12-25, ECF 33 at 61.) But, she argues, "the record is completely void of any evidence" that she knew about his injury, its severity, any work restrictions, or played a role in his assignment to the kitchen. (Defs.'s Reply, ECF 36 at 5.)

Dieter relies on an out-of-district opinion to support her assertion that Panek's testimony about her involvement is self-serving and conclusory. *Acinelli v. Blackmon*, EDCV13381ABPLA, 2015 WL 13286804 (C.D. Cal. Aug. 24, 2015), *report and recommendation adopted*, EDCV13381ABPLA, 2015 WL 13446280 (C.D. Cal. Nov. 20, 2015), *aff'd*, 675 F. App'x 652 (9th Cir. 2017). In *Acinelli*, the AIC-plaintiff submitted a declaration to support his Eighth Amendment claim and show that the defendant-correctional officer had actual knowledge that his work assignment caused him undue pain. In the declaration, the AIC-plaintiff stated that, when his supervising officer called the Assignment Lieutenant to explain his work restrictions, the supervising officer was talking to the defendant-correctional officer. But the defendant-correctional officer denied speaking with any other officers or staff about plaintiff's

work assignment or pain, and the other non-party officers denied speaking with the defendant-correctional officer as well. The AIC-plaintiff did not supply other specific facts to support his assertion, and the record lacked other evidence showing the defendant-correctional officer had actual knowledge. The court thus disregarded the plaintiff's declaration as "self-serving speculation" and recommended summary judgment for the defendant-correctional officer. *Id.* at *7-8. (citing *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015) (court "can disregard a self-serving declaration that states only conclusions and not facts that would be admissible evidence") and *Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1061 (9th Cir. 2011) ("To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations.").

According to Dieter, Panek's testimony that Dieter was displeased with the punishment meted out by the corrections officers and his theory that Dieter pushed for his placement in the kitchen is similarly self-serving and should be disregarded. But the court "may not disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature." *Nigro*, 784 F.3d at 497. And the court disagrees that Panek's testimony on Dieter is conclusory or devoid of specific facts. Panek provided a detailed recollection of his interactions with Winett and Lionel and that recollection is consistent with the undisputed timeline of events. (Panek Dep. 57:14–59:24, ECF 33 at 18.) It is also corroborated in part by his contemporaneous grievances in which he blamed both the work assignment staff *and* the medical staff for disregarding his injury and assigning him to the kitchen. (*See generally*, Thompson Decl. Ex. C, ECF 24-3.) *Cf. FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving

affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.")

Nor does Dieter articulate why Panek's testimony is inadmissible. It is possible that Dieter believes that what Winett and Lionel told Panek is inadmissible hearsay not subject to an exception or exclusion. But when evidence is not presented in an admissible form on summary judgment but may be presented in an admissible form at trial, the court may still consider that evidence. *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents."). Dieter does not argue that Panek cannot present his evidence in an admissible form at trial. *See Goff v. Rode*, 23-15572, 2026 WL 2412757, at *2 n. 2 (9th Cir. Aug. 18, 2026) (reversing lower court and holding that a genuine dispute existed as to whether defendant personally participated in confiscation of AIC-plaintiff's religious item in part because a non-party informed the plaintiff that his item "would not be returned on orders from" the defendant and because that conversation could be presented in an admissible form at trial). Nothing suggests that at least Winett could not testify at trial, and any statements made to him by Dieter and offered by Panek would be admissible as a statement by a party-opponent under Federal Rule of Evidence 801(d)(2)(A).

Even so, that testimony doesn't create a genuine issue of material fact that Dieter was personally involved in Panek's kitchen assignment. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("Liability under section 1983 arises only upon a showing of personal participation by the defendant."). Dieter denies speaking with IWP about Panek. (Dieter Dep. 13:9–14:20, ECF 33 at 64-65.) Hunter denies having a phone conversation with Dieter about Panek. (Hunter Dep.

22:24–23:4, ECF 33 at 113-14.). And neither Winett nor Lionel ever told Panek that Dieter spoke with Hunter at IWP about his work assignment or that she wanted him assigned to the kitchen. (Panek Dep. 62:12-22, ECF 33 at 19.) The parties do not produce any emails or other records supporting Panek's theory. Although his deposition testimony may be sufficient to show that Dieter did not approve of Panek's punishment, it is insufficient to show that Dieter orchestrated his kitchen assignment in violation of his Eighth Amendment rights. That is, getting from Dieter's desire for a greater punishment for the Ensure theft to orchestrating the kitchen assignment is too speculative and not a reasonable inference. Defendants' motion should be granted as to Dieter.

***B. Hunter***

Panek alleges that Hunter knowingly placed him in a "position that required physical exertion beyond his capabilities and in direct violation of his medical restrictions" when she assigned him to the kitchen. (Compl. ¶ 29, ECF 1 at 7.) Unlike Dieter, Hunter oversaw work assignments as the IWP coordinator. Hunter argues that there is no evidence that Panek was under a work restriction when she assigned him to the kitchen nor is there any evidence that Hunter knew about Panek's injury and related work restriction. (Defs.'s MSJ, ECF 23 at 9.)

On the first point, factual issues preclude summary judgment for Hunter. Panek's testimony and supporting record evidence create a genuine dispute of material fact as to whether he was on a work restriction on October 14, 2022. *See Anderson*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). As with his testimony related to Dieter, that it is self-serving is not disqualifying. Panek maintains that he did not work between July 3 and October 13, 2022. (Panek Dep. 43:23-25, ECF

33 at 14.) That assertion is corroborated in part by Dieter's testimony that he was visiting the infirmary for physical therapy and to use the inversion table during that time. (Dieter Dep. 9:10–10:25, ECF 33 at 61.) Panek also produced a medical kite sent the day after his alleged reinjury. He received a response on October 16 which said that Panek was on "medical restriction from work and from sports until 10/18/2022." (Burgess Decl. Ex. G, ECF 33 at 147.) That response came before his medical appointment on October 17, at which he was placed on a work restriction through mid-December. (Panek Dep. 88:2-16, ECF 33 at 25.) Defendants do not address that kite or its response in their reply.

And on the second point, if Panek was in fact on a work restriction, it would be reasonable to infer that the AS-400 reflected that work restriction. To that end, Hunter does not show a lack of genuine dispute on whether she knew about Panek's injury and work restriction when she assigned him to the kitchen. Hunter was aware that kitchen duties included lifting or pushing heavy carts. (Hunter Dep. 20: 9-11, ECF 33 at 111.) She testified, for instance, that she would not assign someone older than 60 to work in the kitchen. (*Id.* 11:7-15, ECF 33 at 102.)

But Hunter remembered little about Panek's injury or work assignment. She said that it would have been her practice to check the AS-400 before assigning an AIC to a job but did not recall specifically whether she checked Panek's medical status or remember what it showed. (*Id.* 16:11-20, ECF 33 at 107.) She then testified that Panek was not on a work restriction solely because he would not have been assigned to the kitchen if he were. (*Id.* 21:4-12, ECF 33 at 112 (answering "yes" when asked whether she was "inferring" that Panek was not "on a no-work status" because he was "assigned to work in the kitchen").)

Defendants do not offer anything besides Hunter's testimony to prove that Panek was not on a work restriction or that the AS-400 did not reflect his work restriction. Nor do defendants put forth any countervailing evidence that Panek worked between July 3 and October 13. And neither party offers anything to show what Panek's medical screen in the AS-400 displayed at the time. At bottom, whether Hunter was or should have been aware of Panek's injury and work restriction comes down to his word against hers. Because credibility determinations are reserved for the jury, summary judgment is not proper as to Hunter. *See Anderson*, 477 U.S. at 255. ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment.").

### *C. Loveland*

Finally, Panek alleges that Loveland violated his Eighth Amendment rights when she was "informed directly by [Panek] of his serious medical condition and his inability to perform strenuous tasks" but "disregarded [his] condition and ordered him to push a heavy dish cart," leading to his injury. (Compl. ¶ 29, ECF 1 at 7.) Having concluded that whether Panek was on a work restriction on October 14, 2022, is a factual issue not suitable for resolution on summary judgment, the only issue left to be resolved with respect to Loveland is whether she was aware of his injury and alleged work restriction, aware of the substantial risk working in the kitchen posed, and whether she disregarded that risk.

Loveland argues first that there is no evidence that she knew Panek was injured or on a work restriction. But that argument is contradicted by the record and Loveland's own admission that, upon arriving at the kitchen, Panek told her about his back injury and that he was on a

medical hold. (Defs.'s Reply, ECF 36 at 6; Panek Dep. 77:9-21, ECF 33 at 22; Loveland Dep. 13:6-10, ECF 33 at 134.) Panek testified that Loveland told him it was good to see him walking without a wheelchair or a cane. (Panek Dep. 79:22-25, ECF 33 at 23.) And when Panek documented what happened that day, he included that he told Loveland about his back injury. Loveland signed that note. (Burgess Decl. Ex. F, ECF 33 at 146.)

Still, Loveland maintains that she did not have "additional facts from which the inference could be drawn that substantial risk of serious harm existed." (Defs.'s Reply, ECF 36 at 6.) Loveland was not "aware of any documented medical restrictions preventing" Panek's placement in the kitchen.[4] (Defs.'s Reply, ECF 36 at 6.) And to Loveland, Panek did not appear unable to work. (Loveland Dep. 10:18-20, ECF 33 at 131.) Panek was not limping or using a wheelchair or walker. (Panek Dep. 78:19–79:13, ECF 33 at 23.) But Panek's own statement to Loveland that he should not be working in the kitchen due to his back injury and related work restriction, along with his note documenting the circumstances surrounding his alleged reinjury, are sufficient to create a genuine dispute as to Loveland's personal knowledge of his injury and the substantial risk working in the kitchen posed. Loveland asserts that her actions were reasonable considering the facts available to her at the time (Defs.'s Reply, ECF 36 at 7), but it would have been equally reasonable for Loveland to infer that a substantial risk of serious harm existed once Panek told her as much.

[4] Defendants argue that, at most, there was an "inadvertent clerical error in which health services failed to accurately document [Panek's] work restriction in the AS-400," which Hunter and Loveland reasonably relied on to conclude there were no work restrictions in place. (Defs.'s Reply, ECF 36 at 7.) But Loveland could not access the AS-400, so that point is of little consequence with respect to her. (Loveland Dep. 9:12-18, ECF 33 at 130.)

Similarly, Loveland cannot rely on the fact that Panek performed his kitchen duties and did not go to sick call. (*See id.*) When Panek told his unit officer that he should not be assigned to work in the kitchen due to his injury and work restriction, the officer told him to report to the kitchen supervisor. Panek did as instructed and told Loveland immediately upon arriving at the kitchen that he was injured and could not work, at which point she told him he “was there to do a job and [he] had to do it.” (Panek Dep. 85:17-22, ECF 33 at 24.) Hunter testified that when an AIC is sick or cannot work for a health-related reason, they are supposed to “go to the work assignment and have a conversation with the supervisor.” (Hunter Dep. 13:12-16, ECF 33 at 104.) The supervisor would then “send them back to their unit and tell them to sign up for sick call so that medical can evaluate them[.]” (*Id.* 14:8-19, ECF 33 at 105.) As Panek correctly points out, that is not what happened here. (Pl.’s Resp., ECF 32 at 5.)

Viewing the evidence in the light most favorable to him, Panek raises a genuine dispute of material fact as to whether Loveland “compelled him to ‘perform physical labor which was beyond his strength, endangered his life or health, or caused undue pain.’” *Morgan*, 465 F.3d at 1045 (quoting *Berry*, 39 F.3d at 1057). Defendants’ motion should be denied as to Loveland.

## CONCLUSION

For the above reasons, defendants’ motion (ECF 23) should be GRANTED in part and DENIED in part. Panek’s negligence claim against ODOC should be dismissed as barred by Eleventh Amendment sovereign immunity. Summary judgment should be granted in Dieter’s favor and denied as to Hunter and Loveland.

\ \ \ \ \

\ \ \ \ \

**SCHEDULING ORDER**

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due within fourteen days. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due within fourteen days. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED: September 29, 2026

JEFF ARMISTEAD
United States Magistrate Judge